IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DAVID M. TITSWORTH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CV-589-PJC |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of the ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Claimant, David M. Titsworth ("Titsworth"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance and supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Titsworth appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Titsworth was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**

At the hearing before the ALJ on March 11, 2010, Titsworth said that he could not work at a job that required sitting, because he could only sit for about 10 or 15 minutes before he had to get up because of a feeling of pressure and pinching of his back. (R. 35, 51). He also had pain down his legs. (R. 51). To relieve his pain, he would lie down three or four times a day, staying in this position for 30 to 45 minutes each time. (R. 51-52). After that time, the pain would not be completely gone, but he could continue with what he was doing. (R. 52).

Titsworth testified that he walked with a limp and he couldn't walk far. (R. 52-53). After walking for a while, his back would hurt and he would feel that he had to lean on something to get relief. (R. 53). By the time he walked from a parking lot to the entrance of a store, he would have difficulty walking, and he would use the grocery cart to walk around. (R. 53-54). He had difficulty walking up stairs due to pain, and he would sit down to rest going up the stairs in his house. (R. 57).

Titsworth testified that Dr. Trinidad had said that he could have surgery, but there was a 50/50 chance that he could "end up in a wheelchair," so he decided not to take that chance. (R. 35-36).

Titsworth was seen at Morton Comprehensive Health Services (the "Morton Clinic") on July 19, 2006 with complaints of back, elbow, and left knee pain. (R. 275-76). The record says that Titsworth had chronic back pain from a car accident one year earlier. (R. 275). Diagnoses were chronic lower back pain and hypertension with increased heart rate. (R. 276). Prescriptions included Motrin, Ultram, and Toprol XL. *Id.*

An MRI of Titsworth's lumbar spine performed on December 6, 2006 showed no disc herniation, but mild congenital spinal stenosis. (R. 218). Records show that Titsworth attended

physical therapy in February and March 2007. (R. 219-20).

Titsworth saw Kenneth R. Trinidad, D.O. on February 23, 2007. (R. 253-54). Titsworth had an automobile accident in October 6, 2006, and he continued to have low back pain. (R. 253). He said that it was worse on the right side and into the right hip. *Id.* He said that the pain was worse with bending, stooping, lifting, and walking. *Id.* Dr. Trinidad said that Titsworth had an antalgic gait favoring the right leg. *Id.* On examination, Titsworth had tenderness and spasm from L4 through S1 with tenderness over the right sacroiliac joint. *Id.* There was normal sensation in the lower extremities with mild weakness in the right leg. *Id.* Dr. Trinidad's impression was "[p]ersistent lumbar strain with right sacroiliac strain and pelvic torsion." *Id.* He prescribed Flexeril, Lodine, Lortab, and a Medrol Dosepak. (R. 253-54).

On March 26, 2007, Dr. Trinidad believed that Titsworth was making progress, but was still having pain in his lower back. (R. 254). He adjusted his medications. *Id.* After seeing Titsworth in April, May, and June, Dr. Trinidad referred him to Dr. David Traub for right sacroiliac joint injection. (R. 250-53).

Titsworth saw Dr. Traub on August 30, 2007. (R. 244). On examination, Titsworth had pain with palpation of the lower back, and his right straight leg raising test was positive. *Id.* Titsworth had two steroid injections in the L5/S1 epidural space in September 2007. (R. 242-43).

Titsworth returned to Dr. Trinidad on September 21, 2007, with continued pain and spasm in his lower back. (R. 250). In October and December 2007, Titsworth continued with some pain, and at the December appointment, Dr. Trinidad found that Titsworth's condition was stable, and he released him from care. (R. 249).

Titsworth presented to the emergency room at the Oklahoma State University Medical Center (the "OSU Hospital") on January 23, 2008 and was kept until the next day for observation. (R. 335-60). The discharge diagnoses were noncardiac chest pain that was likely due to anxiety; history of hypertension; gastroesophageal reflux disease ("GERD"); chronic tobacco use; and history of medical noncompliance. (R. 335).

Titsworth returned to Dr. Trinidad on February 28, 2008 with severe pain in his low back. (R. 247). On examination, Titsworth had tenderness and spasm in the lumbar spine, and he had restricted movement. *Id.* Dr. Trinidad recommended a repeat MRI, and he continued Titsworth's medications. *Id.*

An MRI of Titsworth's lumbar spine was done on March 3, 2008. (R. 265-66). The reviewing physician included a note regarding the structure of Titsworth's lumbar spine, and he noted that the central canal and foramina throughout the entire lumbar spine had a narrowing that was possibly congenital. (R. 266). He additionally found that "[a]t L4/5 and L5/S1 disc bulging is minimal but there is moderate posterior element hypertrophy with mild bilateral foraminal stenosis." *Id.*

On March 13, 2008, Dr. Trinidad said that he discussed treatment options with Titsworth and that "[t]his is a very difficult condition to treat." (R. 247).

On April 14, 2008, Titsworth presented to the emergency room at the OSU Hospital with a headache and elevated blood pressure. (R. 330-33).

On April 24, 2008, Dr. Trinidad again found tenderness in the lumbar area and over the right sacroiliac joint. (R. 246).

Titsworth was seen at the OSU Physicians - Family Medicine clinic (the "OSU Clinic") on May 9, 2008. (R. 574-75). The hand-written notes appear to indicate that Titsworth needed

4

refills for blood pressure and chronic pain medications. (R. 574). On examination, Titsworth had non-pitting edema of his lower extremities. *Id.* Impressions were high blood pressure, GERD, and obesity. (R. 575). At a follow-up appointment on May 23, 2008, Titsworth had pitting edema of his legs, and he was diagnosed with venous stasis in his legs. (R. 567-68).

On June 5, 2008, Dr. Trinidad said that Titsworth appeared "in obvious discomfort." *Id.* On examination, he had tenderness and spasm at L5/S1 bilaterally with particular tenderness over the sacroiliac joint. *Id.* Dr. Trinidad wrote the following:

> This is a difficult condition to treat and we discussed this with him. He is not a surgical candidate. He at this time would like to be released from care. He will continue on his medication and home exercise and weight loss program. I will release him from care and reevaluate his status on an as needed basis.

*Id.*

Titsworth was seen at the Morton Clinic by Njanja Ruenji, PA-C on November 21, 2008 with increased blood pressure, left knee pain when standing, and back pain that would not allow Titsworth to stand for long periods. (R. 269-70). He had also been experiencing a painful cough, and he requested a check for diabetes due to a family history. (R. 269). His weight was 312 lbs., and blood pressure was 130/110. *Id.* Assessments were benign essential hypertension, esophageal reflux, obesity, acute upper respiratory infection, and hyperlipidemia. (R. 270). He was given medications for his hypertension. *Id.*

Titsworth was seen in the emergency room of the OSU Hospital on February 20, 2009 for coughing and difficulty breathing. (R. 315-21). The treating physician diagnosed bronchitis with possible atypical pneumonia. (R. 317).

Titsworth presented to the emergency room at the OSU Hospital on April 9, 2009 with chest pain, and he was kept overnight for observation. (R. 505-21). Discharge diagnoses were chest pain; rule out acute coronary syndrome, gastroesophageal reflux versus musculoskeletal

versus anxiety; hypertension, uncontrolled; GERD; obesity; and tobacco abuse. (R. 512).

Titsworth was seen in the emergency room of the OSU Hospital on July 25, 2009 for overdose. (R. 480-90). He took six Zanaflex and six Mobic because he was upset after he left his children at the park and "they got in trouble with the law." (R. 480). He was transferred to Tulsa Center for Behavioral Health for evaluation. (R. 481).

Titsworth was seen by Elka Serrano, M.D. on July 29, 2009 at Family & Children's Services ("F&CS"). (R. 538-39). Dr. Serrano noted the July 25 incident, and she diagnosed Titsworth on Axis I[1] with recurrent moderate major depressive disorder, and she noted substance abuse in sustained full remission. (R. 539). She scored his Global Assessment of Functioning ("GAF")[2] as 55. *Id.* Dr. Serrano saw Titsworth again on August 19, 2009, and adjusted his medications due to side effects. (R. 540). On October 7, 2009, Titsworth had been off his medications for one week, but had found them effective, so Dr. Serrano prescribed resumption of the medications. (R. 541).

Titsworth was seen in the emergency room of the OSU Hospital on October 8, 2009 for cough, vomiting, and sore throat. (R. 473-79). He was diagnosed with pharyngitis and upper

---

[1] The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM-IV").

[2] The GAF score represents Axis V of the multiaxial assessment system. *See* DSM-IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

respiratory infection. (R. 474). He returned for a complaint of a cough on December 17, 2009. (R. 458-68). He was discharged with impressions of upper respiratory infection, atypical chest pain, and bronchitis. (R. 459).

A treatment plan was entered by an F&CS clinician on February 4, 2010. (R. 528-37). The treatment plan listed Titsworth's Axis I diagnosis as recurrent moderate major depressive disorder. (R. 536). His GAF was scored as 55. (R. 537). Titsworth saw Dr. Serrano on February 22, 2010, and she adjusted his medications. (R. 542).

Titsworth was seen at the OSU Clinic on May 20, 2010 for follow-up after Titsworth had gone to the Saint Francis emergency room. (R. 563-64). On examination, Titsworth had stasis dermatitis and pitting edema of his legs. (R. 563). Diagnoses included diabetes, which Titsworth said had been diagnosed at the Saint Francis emergency room. (R. 564). Titsworth was also diagnosed with morbid obesity, tobacco abuse, and hyperlipidemia. *Id.*

The record contains a letter from Brian D. Worley, M.D. dated May 24, 2010, explaining that Titsworth had sleep apnea that was eliminated when he used a CPAP machine during a sleep test. (R. 544). Dr. Worley recommended that Titsworth use the machine at home. *Id.*

Titsworth was seen at the OSU Clinic on June 17, 2010 for follow-up of his diabetes. (R. 561-62). Pitting edema of his legs was again noted on examination. (R. 561). His diagnoses remained the same as those at the May 20, 2010 appointment, but his diabetes was noted as uncontrolled. *Id.* At a follow-up appointment on July 13, 2010, in addition to other concerns, Titsworth complained of chronic low back pain and knee pain. (R. 559-60). He again had pitting edema in both legs. (R. 559). The physician's impressions were uncontrolled diabetes, controlled hypertension, tobacco abuse, hyperlipidemia, GERD, obesity, low back pain, and bilateral leg edema. (R. 560).

Titsworth presented to the emergency room at the OSU Hospital on July 31, 2010 and August 1, 2010 with right leg pain. (R. 821-78). The attending physician suspected cellulitis and placed Titsworth on antibiotics. (R. 825-26).

At a follow-up appointment at the OSU Clinic on August 10, 2010, Titsworth again had pitting edema in both legs. (R. 557-58). The physician's impressions included diabetes, hypertension, hyperlipidemia, morbid obesity, and GERD. (R. 558). At a follow-up appointment on September 21, 2010, impressions were controlled diabetes, hypertension, morbid obesity, and microalbuminuria. (R. 553-54). The physician noted that Titsworth's hypertension was not at goal for a person with diabetes. (R. 554). At an appointment at the OSU Clinic on February 8, 2011, impressions were controlled diabetes, uncontrolled hypertension, hyperlipidemia, microalbuminuria, and tobacco abuse. (R. 551-52). On March 3, 2011, Titsworth's diabetes was again characterized as uncontrolled, as was his hypertension. (R. 548-49). He was seen again April 5, 2011, at which times his diabetes was stated as uncontrolled and his hypertension was noted as controlled. (R. 546-47).

Agency consultant Patrice Wagner, D.O. examined Titsworth and prepared a report dated March 27, 2009. (R. 297-302). Titsworth's chief complaint was chronic pain in his knees and back. (R. 297). Dr. Wagner said that Titsworth moved his extremities well, except for his left knee, and he had pain with motion of the knee. (R. 298). Titsworth moved about the examination room easily, and he had full range of motion of the spine. *Id.* Straight leg raising was negative. *Id.* Titsworth had a limp favoring his left leg, but his gait was stable at an appropriate speed without the use of assistive devices. *Id.* Dr. Wagner's assessments were chronic back and knee pain, hypertension, GERD, morbid obesity, and tobacco abuse. *Id.* The lumbosacral spine backsheet completed by Dr. Wagner indicates that Titsworth had pain with

8

motion of his back, but his range of motion was within normal limits. (R. 302).

Agency nonexamining consultant Thurma Fiegel, M.D., completed a Physical Residual Functional Capacity Assessment dated April 1, 2009. (R. 304-11). Dr. Fiegel found that Titsworth had the exertional capacity to perform medium work. (R. 305). In the space for narrative explanation, Dr. Fiegel noted that Titsworth had not been treated surgically for his back or knee pain complaints, and she noted the results of the 2006 MRI. She noted that Titsworth had a stable gait with a limp of his left leg at the examination by Dr. Wagner, and that Titsworth had pain when moving the left knee. *Id.* For postural limitations, Dr. Fiegel found that Titsworth could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (R. 306). She found Titsworth had no other physical limitations. (R. 307-08).

## Procedural History

Titsworth filed applications in January 2009 seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 126-30). Titsworth alleged onset of disability as January 15, 2009. (R. 126). The applications were denied initially and on reconsideration. (R. 67-75, 80-85). A hearing before ALJ John Volz was held March 11, 2010. (R. 30-61). By decision dated April 30, 2010, the ALJ found that Titsworth was not disabled. (R. 16-25). On August 3, 2011, the Appeals Council denied review of the ALJ's findings. (R. 3-8). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

The ALJ found that Titsworth met insured status through September 30, 2009. (R. 18). At Step One, the ALJ found that Titsworth had not engaged in any substantial gainful activity since his alleged onset date of January 15, 2009. *Id.* At Step Two, the ALJ found that Titsworth had a severe impairment of degenerative disc disease of the lumbar spine. *Id.* At Step Three, the ALJ found that Titsworth's impairments did not meet a Listing. (R. 19).

The ALJ determined that Titsworth had the RFC to perform the full range of sedentary work. *Id.* At Step Four, the ALJ found that Titsworth was unable to perform any past relevant work. (R. 23). At Step Five, the ALJ used the "Grids"[4] to find that there were jobs in significant numbers in the national economy that Titsworth could perform, taking into account his age, education, work experience, and RFC. (R. 24). Therefore, the ALJ found that Titsworth was not disabled from January 15, 2009, through the date of his decision. *Id.*

## Review

Titsworth makes four arguments that the ALJ's decision should be reversed. First, he faults the ALJ's Step Three finding that Titsworth did not meet Listing 1.04A. Second, Titsworth faults the ALJ's use of the Grids at Step Five. Third, also at Step Five, he faults the hypothetical question propounded to the vocational expert (the "VE"). Fourth, Titsworth faults

---

[4] The Grids are the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.

11

the ALJ's credibility assessment. Regarding the issues raised by Titsworth, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Therefore, the ALJ's decision is affirmed.

**Step Three Issues**

Titsworth argues that he meets Listing 1.04A, and therefore the ALJ's conclusion to the contrary is erroneous. Listing 1.04A requires a condition, such as degenerative disc disease, with "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." The ALJ found degenerative disc disease at Step Two, but at Step Three, he found that Titsworth did not have nerve root compression. (R. 19). He also found that "[t]he record does not reflect any motor loss for the claimant." *Id.*

There is substantial evidence supporting the ALJ's analysis that Titsworth did not meet Listing 1.04A. When Dr. Trinidad examined Titsworth on February 23, 2007, he observed normal sensation in the legs with only mild weakness in the right leg. (R. 253). Dr. Traub found positive straight leg raising on the right side on August 30, 2007. (R. 244). These records by Dr. Trinidad and Dr. Traub are more than one year before the relevant time period, which begins on January 15, 2009. At the consulting examination on March 27, 2009, Dr. Wagner found that Titsworth had full range of motion of the spine, and straight leg raising was negative. The evidence provided by Dr. Wagner's examination demonstrates that Titsworth did not meet the requirements of limitation of motion of the spine and positive straight-leg raising. There is a lack of evidence within the time period to establish any of the requirements of Listing 1.04A beyond the degenerative disc disease that the ALJ found. For these reasons, the ALJ's finding at Step

Three is supported by substantial evidence.

Titsworth points to evidence that simply does not support his arguments. For example, in arguing that he had "nerve root involvement" "resulting in a neuroanatomic distribution of his pain," Titsworth cites to only two records: the 2008 MRI and the 2007 record of Dr. Traub. (R. 244, 265-66). The undersigned finds no direct reference to nerve root compression in either of these documents. While Dr. Traub found radicular pain down Titsworth's right leg, and he found positive straight leg raising on the right side, the 2008 MRI did not establish a "neuroanatomic distribution of pain." Dr. Traub's examination, in August 2007, simply does not establish this requirement of Listing 1.04A, especially when subsequent examinations of Titsworth within the relevant time period do not indicate any radicular symptoms. Similarly, to establish the requirement of muscle weakness, Titsworth cites only to the February 2007 initial examination of Dr. Trinidad that noted "mild" weakness in the right leg. (R. 253). This one record almost two years before the relevant time period does not establish this requirement to meet Listing 1.04A. The ALJ's conclusion that Titsworth's degenerative disc disease did not meet the requirements of Listing 1.04A was supported by substantial evidence.

**Application of the Grids**

At Step Five, the use of the Grids is limited when the claimant has nonexertional limitations. *See Mitchell v. Astrue*, 2012 WL 4478369 *1 (10th Cir.) (unpublished). The Grids may be used when a claimant has nonexertional limitations when the claimant can perform a substantial majority of the work in the exertional category. *Id.*, *quoting Evans v. Chater*, 55 F.3d 530, 532 (10th Cir. 1995).

Titsworth first argues that the ALJ did not adequately explain how his pain would permit application of the Grids. As discussed below, the ALJ's credibility assessment adequately

13

addresses whether Titsworth's pain prevented the ALJ's use of the Grids. The ALJ's decision, as a whole, explains that Titsworth is limited to sedentary work, but can perform the entire range of sedentary work. *See, e.g., Cobb v. Astrue*, 364 Fed. Appx. 445, 450 (10th Cir. 2010) (unpublished) (while ALJ's credibility assessment was summary, taking the decision as a whole the ALJ's findings regarding the claimant's testimony were "clear enough" and did not violate rule against *post hoc* justification). Limiting Titsworth to sedentary work was based on the severe impairment of degenerative disc disease and the ALJ specifically stated that limiting Titsworth to sedentary work "should reasonably be expected to limit aggravating his pain." (R. 23). The ALJ's decision found that Titsworth's statements were not entirely credible, and he gave specific reasons that were closely linked to significant evidence. (R. 21). Therefore, the fact that Titsworth had pain did not bar the ALJ from using the Grids in a case where the ALJ had already taken into account Titsworth's pain by limiting him to sedentary work. *See, e.g., Armijo v. Astrue*, 385 Fed. Appx. 789, 796 (10th Cir. 2010) (unpublished) (use of Grids was proper when substantial evidence supported the ALJ's finding that the claimant's nonexertional limitations had little effect on his ability to perform the entire range of light work); *Spaulding v. Asrue*, 379 Fed. Appx. 776, 779 (10th Cir. 2010) (unpublished) (ALJ's pain analysis that the claimant could still perform the entire range of sedentary work was supported by substantial evidence, and therefore the use of the Grids was not precluded).

Titsworth also raises his depression as a nonexertional limitation that precluded the use of the Grids. The ALJ found, however, that Titsworth's depression was controlled when he took his medications, and he therefore found it to be a nonsevere impairment. (R. 18). The ALJ reviewed the evidence of Titsworth's July 2009 overdose incident and his subsequent treatment for depression at F&CS. These records provide substantial support for his conclusion that

14

Titsworth's depression was a nonsevere impairment.

In *Mitchell*, the ALJ found that the claimant's depression was a severe impairment, and he included nonexertional limitations in his RFC determination to address it. *Mitchell*, 2012 WL 4478369 at *2. The ALJ nevertheless applied the Grids because he found that the claimant could still perform "a substantial majority of light unskilled work." *Id.* at *3. The Tenth Circuit affirmed the use of the Grids in this circumstance, because the ALJ had discussed the mental impairment and its effect on job performance, including how it affected the performance of work in the categories used in the Grids. *Id.*

Here, in contrast to the ALJ's decision in *Mitchell*, the ALJ decided that Titsworth's depression was nonsevere, and it is evident that his reasoning was that Titsworth's depression was controlled by medications and therefore did not affect his job performance. The ALJ discussed the medical evidence that supported his conclusion that Titsworth's depression was nonsevere. Under these circumstances, it is clear that Titsworth's depression did not affect his ability to perform a substantial majority of the work in the sedentary category, and therefore there was no error in the ALJ's use of the Grids at Step Five.

Because the undersigned finds no error in the ALJ's use of the Grids at Step Five, there is no need to address Titsworth's contention that the ALJ's hypothetical question propounded to the VE was erroneous. This portion of Titsworth's argument is moot. The undersigned finds no error at Step Five of the ALJ's decision.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations]. Not only does an ALJ see far more social security cases than do appellate judges, [the ALJ] is uniquely able to observe the demeanor and gauge the physical abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002). In evaluating credibility, an ALJ must give specific reasons that are closely linked to substantial evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186. "[C]ommon sense, not technical perfection, is [the] guide" of a reviewing court. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1167 (10th Cir. 2012).

In his decision, the ALJ followed the factors described in SSR 96-7p and gave several reasons[5] for finding Titsworth's testimony to be less than fully credible. (R. 20-21). The ALJ first noted Titsworth's activities of daily living, as he had reported them on administrative forms. (R. 21). The ALJ then recounted Titsworth's allegations regarding his pain and how pain limited his ability to sit or walk. *Id.* The ALJ listed many of the medications that Titsworth had been prescribed to alleviate his symptoms. *Id.* He noted that Titsworth had received steroid injections and that Titsworth testified that he needed to lie flat several times a day to alleviate his

---

[5] Titsworth faults the introductory language used by the ALJ: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (R. 20). While this language might have been "meaningless boilerplate," it was merely an introduction to the ALJ's analysis and was not harmful. *See Keyes-Zachary*, 695 F.3d at 1170 (use of boilerplate language in a credibility assessment is problematic only "in the absence of a more thorough analysis") (further quotations omitted).

symptoms. *Id.* The ALJ then reviewed the medical evidence of Titsworth's treatment for his physical complaints and then for his depression. (R. 21-23). After that review, the ALJ concluded this portion of his decision by stating: "While [Titsworth] does suffer from some back pain, he has never had surgery, and there are no objective signs indicating herniation or impingement. Limiting him to sedentary work should reasonably be expected to limit aggravating his pain." (R. 23).

Titsworth first attacks the ALJ's discussion of activities of daily living. He says that the ALJ's discussion does not demonstrate that Titsworth could do these activities for an eight-hour work day. Here, the undersigned would not describe Titsworth's activities of daily living as "minimal," but the Tenth Circuit has noted that "[a]lthough minimal ADLs alone do not constitute 'substantial evidence that a claimant does not suffer disabling pain,' an ALJ may consider ADLs as part of his evaluation of a claimant's credibility." *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 823 (10th Cir. 2011) (unpublished), *quoting Hamlin*, 365 F.3d at 1220-21 (further quotations and citations omitted). Here, Titsworth reported activities of daily living, and the ALJ rightly considered those reported activities as one part of his credibility analysis. There was no error in this portion of the ALJ's decision.

Next, Titsworth complains that the ALJ did not specify which part of Titsworth's testimony he accepted as true, which Titsworth claims is required. Plaintiff's Opening Brief, Dkt. #12, pp. 5-6. The Tenth Circuit rejected this argument in *Keyes-Zachary*, stating that it failed to demonstrate reversible error when the ALJ's discussion "performed the essential function of a credibility analysis by indicating to what extent he credited what [the claimant] said when determining the limited effects of her symptoms." *Keyes-Zachary*, 695 F.3d at 1170. Here, it is clear that the ALJ credited most of Titsworth's allegations, because he rejected the

17

opinion of Dr. Fiegel that Titsworth could perform medium work. (R. 23). The ALJ specifically found instead that Titsworth was limited to sedentary work in order to accommodate his pain. *Id.* Thus, this is not a case where the ALJ completely rejected the claimant's allegations of pain, but instead the ALJ here largely credited Titsworth's claims.

Titsworth is correct that the ALJ, while noting the medications that Titsworth took, should have also discussed the effectiveness of these medications and their side effects. Here, however, the ALJ's failure in this one aspect of his credibility discussion "would not have affected the outcome in this case. The alleged error is harmless." *Keyes-Zachary*, 695 F.3d at 1173. The evidence regarding lack of effectiveness of Titsworth's medications, or their side effects, was simply not strong enough to overcome the otherwise thorough credibility discussion of the ALJ.

Titsworth finally argues that the ALJ should have given him credit for several items, such as his need to stand during the hearing. He notes that no treating or examining physician said that he could work full-time and that none of his treating physicians stated that he exaggerates his symptoms. The Tenth Circuit rejected a similar argument in *Keyes-Zachary* that the ALJ erred by failing to consider the claimant's "motivation to work" as a positive credibility factor when the claimant had attempted to work for three months. *Keyes-Zachary*, 695 F.3d at 1173. The court said that the ALJ's failure to consider this evidence did not constitute reversible error. *Id.* Here, none of Titsworth's arguments that the ALJ was required to consider certain positive factors establishes reversible error, and the ALJ's credibility assessment remains supported by substantial evidence. *Miller ex rel. Thompson v. Barnhart*, 205 Fed. Appx. 677, 681 (10th Cir. 2006) (unpublished) (claimant disputed ALJ's view of evidence and relied on other evidence, but court declined to reweigh evidence).

"In sum, the ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard. 'Our precedents do not require more, and our limited scope of review precludes us from reweighing the evidence or substituting our judgment for that of the agency.'" *Zaricor-Ritchie*, 452 Fed. Appx. at 824, *citing Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (further quotations omitted).

## Conclusion

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied. The decision is **AFFIRMED**.

Dated this 4th day of January 2013.

_____
Paul J. Cleary
United States Magistrate Judge